United States District Court
For the Northern District of California

1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8  IN RE: ONLINE DVD RENTAL
   ANTITRUST LITIGATION                    No. M 09-2029 PJH
   _____/
9
                                          **AMENDED[1] ORDER GRANTING**
                                          **MOTION FOR SUMMARY JUDGMENT**
10  This Document Relates to:

11  ALL ACTIONS
    _____/
12

13          Defendant's motion for summary judgment and the parties' motions to exclude

14  testimony and to strike certain evidence came on for hearing on August 31, 2011 before

15  this court.  Plaintiffs, individuals representing a class comprised of subscribers to the online

16  DVD rental service of Netflix, Inc. ("Netflix plaintiffs"), appeared through their class counsel,

17  Gregory Baker, Eugene A. Spector, Joseph J. Tabacco, Guido Saveri, Craig Corbitt,

18  Matthew Ruan, David Sorensen, and Sarah Schalman-Bergen.  Defendant Netflix, Inc.

19  ("Netflix") appeared through its counsel, Jonathan M. Jacobson, Dylan Liddiard, Anthony

20  Weibell, and David Reichenberg.  Defendants Walmart.com USA LLC ("Walmart.com") and

21  Wal-Mart Stores, Inc. ("Wal-Mart Stores")(collectively "Walmart") appeared through their

22  counsel, Lin Wang.  Having read all the papers submitted and carefully considered the

23  relevant legal authority, the court hereby GRANTS defendant's motion for summary

24  judgment, and DENIES the motions to exclude and/or strike testimony, for the reasons

25  stated at the hearing, and as follows.

26

27  _____

28          [1]     The court issues the instant amended order in order to address the few
    typographical errors and/or inconsistencies noted by defense counsel in its letter to the court
    dated November 23, 2011.

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## BACKGROUND

The present actions have been consolidated into a larger multidistrict litigation ("MDL") proceeding.  In the instant actions, the plaintiff class of Netflix subscribers generally asserts that defendants Netflix and Walmart engaged in collusive activity prohibited under the Sherman Act by entering into an agreement to divide the market for sales and online rentals of DVDs in the United States.

A.      Netflix and the Online DVD Rental Market

Netflix, Inc., founded in 1997 and launched in 1998, offers online DVD rental services to consumers.  See Declaration of Reed Hastings ISO Netflix MSJ ("Hastings Decl."), ¶¶ 2-3; see also Declaration of Matthew W Ruan ISO Summ. Judg. Opp. ("Ruan Decl."), Exs. 2-4.  When the company – which provides DVD movies and other content for rent by mail – initially launched its website, it did so with a pay-per-rental model of services, and in addition provided consumers with the option of purchasing DVDs that Netflix offered for sale.  Hastings Decl. at ¶ 3.  However, after co-founder Reed Hastings ("Hastings") assumed the responsibilities of chief executive officer ("CEO") for Netflix in late 1998, the company ceased offering rentals on a pay-per-rental basis and adopted a monthly subscription rental model[2] instead.  Id. at ¶ 5.  Hastings also recommended that Netflix stop offering DVDs for sale, and by 2000, the company's offerings were limited to subscription rentals only.  Id.

Beginning in 1998, Netflix entered into a series of promotional arrangements with major sellers of new DVDs and DVD players, including Amazon, Musicland and Best Buy. While the terms of each promotional agreement differed in specifics, the general terms of all agreements required Netflix to promote sales of new DVDs by Amazon, Musicland and Best Buy, in exchange for these sellers' agreements to promote Netflix's DVD rental

---

[2]      The subscription rental model incorporates different subscription plans, which are referred to by the total number of DVDs that a consumer may rent at any given time.  A "3U" plan, for example, refers to an unlimited plan pursuant to which consumers could rent 3 DVDs at any given time.  A "2U" plan, similarly, refers to a plan under which a consumer could rent 2 DVDs at a time, on an unlimited basis.

2

United States District Court

For the Northern District of California

1   services.  See Ruan Decl., Ex. 6; Ex. 8; Ex. 10; Ex. 11.  While the 1998 Netflix-Amazon

2   agreement expressly prohibited Netflix from selling new DVDs, neither of the subsequent

3   promotional agreements with Musicland or Best Buy contained similar provisions expressly

4   prohibiting Netflix from selling new DVDs.  See id.  As recently as 2005, the Netflix-Best

5   Buy agreement was still in effect.  See Ruan Decl., Exs. 14-17.[3]

6       Throughout the majority of these early years, Netflix had little competition in the

7   online DVD rental market.

8   B.   Expansion of the Online DVD Rental Market and Ensuing Price Competition

9       In June 2003, Walmart entered the online DVD rental market by launching its own

10  online DVD rental service.  See Declaration of Anthony Weibell ISO Summ. Judg. ("Weibell

11  Decl."), Ex. 34; Ruan Decl., Ex. 24.  At the time Walmart launched, Netflix's 3U plan was

12  priced at $19.95 per month.  When Walmart entered, it did so with a 3U plan offered at

13  $18.76 per month.  See Weibell Decl., Ex. 29, App. 1.  Although Walmart entered with a

14  lower price point for its 3U plan, Netflix's 3U pricing remained unaffected for approximately

15  one year.  In June 2004, Netflix changed its pricing, and increased the price of its 3U plan

16  to $21.99 per month.  See Weibell Decl., Ex. 29, App. 1; Ruan Decl., Ex. 55 (press

17  release).

18      In August 2004, two months after Netflix had raised its 3U price, a third competitor –

19  Blockbuster – entered the online DVD rental market.  Blockbuster entered the market with a

20  3U plan offered at $19.99, which plan also included 2 free monthly coupons for in-store

21  rentals.  See Weibell Decl., Ex. 39.

22      In October 2004, there were rumors that yet another competitor – Amazon – was

23  about to enter the online DVD rental market.  See Weibell Decl., Exs. 40-41; Hastings

24  _____

25      [3]      Plaintiffs rely upon the Amazon, Musicland, and Best Buy agreements not only
    as background, but as a critical part of their legal argument that Netflix's conduct in executing
26  the Promotion Agreement constitutes a restraint of trade.  However, as the court agrees with
    defendant that none of these agreements were expressly pled as a basis for unlawful conduct
27  in the operative consolidated amended complaint, plaintiffs are foreclosed from now
    introducing these agreements as a basis for purportedly unlawful conduct.  As such, the court
28  takes note of the agreements, but does so for contextual purposes only.

United States District Court

For the Northern District of California

1   Decl., ¶¶ 13, 16.  Amidst these rumors and following Blockbuster's recent entry into the

2   market, Netflix announced on October 14, 2004 that beginning November 1, it would lower

3   the price on its 3U plan from $21.99 per month to $17.99 per month.  See Hastings Decl.,

4   ¶¶ 13, 16.; see also Ruan Decl., Exs. 59-60.  The very next day, Blockbuster responded,

5   and announced that it would lower its 3U price from $19.99 per month to $17.49 per month.

6   See Ruan Decl., Ex. 62; Weibell Decl., Ex. 29, App. 1.  Shortly after that, on November 1,

7   2004, Walmart also responded, and reduced its 3U price from $18.76 per month, to $17.36

8   per month.  See Ruan Decl., Ex. 63; Weibell Decl., Ex. 29, App. 1.

9        On December 22, 2004, Blockbuster further reduced the price of its 3U plan to

10   $14.99 per month.  Ruan Decl., Ex. 74.  Netflix did not lower its price in response, and kept

11   its 3U plan at $17.99 per month.  See Weibell Decl., Ex. 29, App. 1.  On January 7, 2005,

12   Walmart dropped its separate 2U plan to $12.97 per month.  See Ruan Decl., Exs. 76-77.

13   C.      Netflix Reaches out to Walmart

14        On October 17, 2004, in the midst of the aforementioned price competition, Hastings

15   asked to be introduced to Walmart CEO John Fleming ("Fleming").  See Ruan Decl., Ex.

16   64.  Hastings' motivation for initiating contact with Fleming was purportedly to seek

17   assistance in competing against the perceived Amazon threat.  See Ruan Decl, Ex. 65

18   (Hastings email); see also Hastings Decl., ¶¶ 17-19.  An in-person meeting between the

19   two took place at Walmart's offices on October 27, 2004.  See Ruan Decl., Ex. 67; Hastings

20   Decl., ¶ 18.  There are no notes of that meeting, and no other witnesses to that meeting.

21   However, Hastings testifies that at the meeting, he suggested developing an alliance

22   whereby Netflix could help Walmart compete with Amazon in sales of DVDs, while Walmart

23   could assist Netflix in competing against Amazon in online DVD rentals.  See Hastings

24   Decl., ¶ 17; Weibell Decl., Ex. 43.  Hastings also testifies that he sought to gauge whether

25   Walmart might be looking for a suitor to acquire its rental subscriber base.  See Hastings

26   Decl., ¶ 17; Weibell Decl., Ex. 2 at 170:18-171:21.  Fleming, for his part, testifies that the

27   two discussed how to "monetize" internet traffic, and confirms that the two would have

28

4

**United States District Court**
For the Northern District of California

1   talked about DVD sales.  See Ruan Decl., Ex. 23 at 204:7-205:5; 208:20-21.  Both agree,

2   however, that no agreement was reached between them at the October 27 meeting.  See

3   Weibell Decl., Ex. 2 at 171:22-172:6; Ruan Decl., Ex. 71; Hastings Decl., ¶ 19.

4          Separately, at the time of the October 2004 meeting between Hastings and Fleming,

5   Walmart was pursuing a partnership with Yahoo!, with the aim of increasing Walmart's

6   subscriber base.  See Ruan Decl., Exs. 51-52.  Walmart's subscriber base had not reached

7   above 60,000 subscribers – compared to over 2 million for Netflix, and over 400,000 for

8   Blockbuster, as of December 2004.  See Weibell Decl., Ex. 29, ¶¶ 23, 32, 41.  Walmart was

9   also considering exiting the online DVD rental business.  See Weibell Decl., Ex. 10 at

10  127:12-128:8.

11  D.     The Final Agreement

12         Hastings reached out to Fleming again at a February 9, 2005 meeting held over

13  dinner.  See Hastings Decl., ¶ 24; Weibell Decl., Ex. 7 at 21:7-16, 37:10-14.  Hastings

14  testified that he renewed his approach to Fleming because he believed that recent changes

15  in the business might have led Walmart to change its mind.  See Hastings Decl., ¶¶ 23-24.

16  At the meeting, Hastings presented Fleming with a Netflix DVD mailer with a mock

17  advertisement stating "'buy dvd's at walmart.com.'"  See Ruan Decl., Ex. 87.  No

18  agreement was reached at this meeting, but Fleming expressed willingness to continue

19  discussions.  Hastings Decl. at ¶ 25.

20         By March 17, 2005, Hastings and Fleming reached a verbal agreement in principle

21  with respect to the terms of a "Promotion Agreement."  See Weibell Decl., Ex. 54; Ruan

22  Decl., Ex. 99 at *225974.  Pursuant to the terms of the agreement, existing Walmart DVD

23  rental subscribers would be transitioned to Netflix, if they chose, at the same price as their

24  Walmart subscription, and Netflix would import their rental selections.  Netflix would pay

25  Walmart for each subscriber that elected to transfer or who was referred via promotions on

26  Walmart's website.  Netflix, in turn, would promote Walmart DVD sales.  See Weibell, Ex.

27  54; Hastings Decl., ¶ 27.

28

United States District Court

For the Northern District of California

1    The agreement between Netflix and Walmart was finalized between March 2005 and

2    May 2005, and publicly announced on May 19, 2005.  See Weibell Decl., Ex. 55.  The final

3    written agreement mirrored the terms of the verbal agreement: Netflix agreed to pay a 10%

4    revenue share to Walmart for each subscriber who transferred to Netflix, and a $36 bounty

5    for each new subscriber Netflix gained via referral from Walmart.  See Weibell Decl., Ex. 1

6    (the "Promotion Agreement").  There were no express covenants not to compete contained

7    in the agreement.  See id.

8    On May 19, 2005, the same day the Promotion Agreement was publicly announced,

9    Netflix issued a separate press release informing investors that the agreement was not a

10    material event due to the small number of Walmart subscribers.  See Hastings Decl., Ex. A.

11    E.    Walmart Exits the Online DVD Rental Market

12    Subsequent to the execution of the Promotion Agreement, Walmart exited the

13    business in mid-2005.  The threat of Amazon's entry into the online DVD rental market

14    never having materialized, Netflix remained in the market with Blockbuster as its primary

15    competitor.  On December 3, 2007, Hastings met with Blockbuster CEO Jim Keyes, and

16    proposed that Netflix and Blockbuster "work together."  See Ruan Decl., Exs. 112-13.

17    Blockbuster, however, eventually filed for bankruptcy in September 2010.  See Ruan Decl.,

18    Ex. 115.

19    Meanwhile, Netflix's 3U price, which was lowered to $17.99 on November 1, 2004,

20    remained at the same $17.99 price until July 2007.  Weibell Decl., Ex. 29, App. 1.

21    F.    The Instant Actions

22    In 2009, plaintiffs filed several actions against defendants Netflix and Walmart,

23    arising out of the Promotion Agreement.  The actions were consolidated for pretrial

24    proceedings by the Judicial Panel on Multidistrict Litigation, and a consolidated amended

25    complaint was filed on May 27, 2009.  The complaint generally alleges that defendants

26    Netflix and Walmart improperly entered into an unlawful market allocation agreement by

27    entering into the Promotion Agreement on May 19, 2005, and that the Promotion

28

6

United States District Court

For the Northern District of California

Agreement had the effect of illegally dividing the markets for sales and online rentals of DVDs in the United States. See Consolidated Amended Class Action Complaint ("Complaint"), ¶¶ 1-2.

Plaintiffs assert four causes of action against Netflix and Walmart: (1) a Sherman Act, section 1 claim for unlawful market allocation of the online DVD rental market (against all defendants); (2) a Sherman Act, section 2 claim for monopolization of the online DVD rental market (against Netflix); (3) a Sherman Act, section 2 claim for attempted monopolization of the online DVD rental market (against Netflix); and (4) a Sherman Act, section 2 claim for conspiracy to monopolize the online DVD rental market (against all defendants). See Complaint, ¶¶ 74-92.

By order dated December 23, 2010, the court granted plaintiffs' motion for class certification, certifying the following class: "Any person or entity in the United States that paid a subscription fee to Netflix on or after May 19, 2005 up to and including the date of class certification." See Docket No. 287.

Fact discovery closed on December 6, 2010, and expert discovery closed in April 2011.

On September 2, 2011, the court granted preliminary approval (having previously denied the motion on March 11, 2011) of a class action settlement between the instant plaintiff class, and the Walmart defendants. The final approval hearing has been scheduled for March 14, 2012.[4]

G.    The Present Motions

Remaining defendant Netflix now brings this motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56, seeking summary judgment in its favor as

---

[4]    The court notes that the underlying MDL also consists of companion actions brought by subscribers of Blockbuster's online DVD rental service against defendants Walmart and Netflix. On April 29, 2011, however, the court granted summary judgment in those actions in Netflix's favor, based on lack of antitrust standing. By stipulation of the parties entered on August 15, 2011, the April 29 order also extends to claims asserted against Walmart by the Blockbuster plaintiffs.

United States District Court

For the Northern District of California

1   to all claims asserted by plaintiffs.  The parties have also filed motions to exclude expert

2   testimony, as well as motions to strike certain evidence in the record.

3                                      **DISCUSSION**

4   A.      Netflix's Motion for Summary Judgment

5           1.      Legal Standard

6           Summary judgment is appropriate when there is no genuine issue as to material

7   facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

8   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

9   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

10  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

11          A party seeking summary judgment bears the initial burden of informing the court of

12  the basis for its motion, and of identifying those portions of the pleadings and discovery

13  responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

14  v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

15  at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

16  than for the moving party.  S. Cal. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th

17  Cir. 2003).

18          On an issue where the nonmoving party will bear the burden of proof at trial, the

19  moving party can prevail merely by pointing out to the district court that there is an absence

20  of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

21  moving party meets its initial burden, the opposing party must then set forth specific facts

22  showing that there is some genuine issue for trial in order to defeat the motion.  See Fed.

23  R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

24          2.      Analysis

25          Generally speaking, in order for plaintiffs to recover under sections 1 and 2 of the

26  Sherman Act, plaintiffs must establish three elements: (1) anticompetitive conduct; (2)

27  injury-in-fact; and (3) antitrust injury, i.e., "'injury of the type the antitrust laws were intended

28

United States District Court

For the Northern District of California

1   to prevent and that flows from that which makes defendants' act unlawful.'" See Brunswick

2   Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Netflix's motion for summary

3   judgment focuses on plaintiffs' ability to prove the first two of these elements, and raises

4   the following issues for resolution:  whether the Promotion Agreement is a market allocation

5   agreement for which per se treatment is appropriate under section 1 of the Sherman Act; if

6   not, and applying rule of reason analysis, whether the Promotion Agreement constitutes an

7   unreasonable restraint of trade; and whether plaintiffs have sufficiently demonstrated

8   causal injury in fact.

9        Additionally, defendants argue that for the same reasons that they contend preclude

10  plaintiffs from prevailing on a section 1 claim under the Sherman Act, plaintiffs' section 2

11  monopolization claims under the Sherman Act also fail.

12       The court addresses each of the foregoing, in turn.

13            a.    Per Se Violation

14       Section 1 of the Sherman Act, as construed, prohibits "unreasonable" contracts,

15  combinations, or conspiracies in restraint of trade.  See 15 U.S.C. § 1.  Whether a restraint

16  of trade is unreasonable generally turns on "the facts peculiar to the business, the history of

17  the restraint, and the reasons why it was imposed."  See Nat'l Soc'y of Prof'l Eng'rs v.

18  United States, 435 U.S. 679, 692 (1978).  However, when a given business practice

19  "facially appears to be one that would always or almost always tend to restrict competition

20  and decrease output," rather than one designed to increase economic efficiency and render

21  markets more competitive, that practice is considered "per se illegal" and may be

22  condemned without further analysis.  See, e.g., Broad. Music, Inc. v. CBS, 441 U.S. 1, 19-

23  20 (1979); see also California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1133 (9th Cir.

24  2011)(quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997))("Some types of restraints,

25  however, have such predictable and pernicious anticompetitive effect, and such limited

26  potential for procompetitive benefit, that they are deemed unlawful per se").  Thus, to

27  determine whether an agreement is unreasonable, the court must decide at the threshold

28

9

United States District Court

For the Northern District of California

1   whether it is per se illegal or whether it must be analyzed under the "rule of reason."

2   Paladin Assoc., Inc. v. Mont. Power Co., 328 F.3d 1145, 1155 (9th Cir. 2003).

3        Plaintiffs contend that the Promotion Agreement is in form and function a market

4   allocation agreement.  A market allocation agreement that divides up the market for a given

5   service or product amongst competitors at the same market level, is generally considered

6   "a classic [] antitrust violation" for which per se condemnation is appropriate.  See United

7   States v. Brown, 936 F.2d 1042, 1045 (9th Cir. 1991); United States v. Topco Assocs., Inc.,

8   405 U.S. 596, 608 (1972); see also Safeway, 651 F.3d at 1137 (quoting Metro Indus., Inc.

9   v. Sammi Corp., 82 F.3d 839, 844 (9th Cir.1996)("'Classic' horizontal market division

10  agreements are ones in which 'competitors at the same level agree to divide up the market

11  for a given product'").

12       According to plaintiffs, both the direct and circumstantial evidence demonstrates at

13  the very least that Walmart agreed to exit from the online DVD rental market, and at most

14  that it did so in a classic "quid pro quo" exchange for Netflix's agreement not to sell DVDs in

15  competition with Walmart.  Defendant, for its part, responds that the Promotion Agreement

16  lacks the hallmarks of a garden variety market allocation agreement warranting per se

17  treatment, since the Promotion Agreement does not restrict or prevent Netflix from

18  engaging in the sale of new DVDs, nor does it prevent Walmart from re-entering the online

19  DVD rental market.  Moreover, defendants alternatively characterize the Promotion

20  Agreement as an acquisition by Netflix of Walmart's online DVD rental subscriber base,

21  and as having enhanced output efficiencies in both online DVD rental and sales markets –

22  both of which, if credited, would preclude per se treatment.

23       The Promotion Agreement itself recites at the outset that Walmart "has

24  independently determined to cease operations of its DVD rental service;" that Walmart and

25  Netflix desire to work together to "provide and promote a program by which existing

26

27

28

10

customers of the [Walmart] DVDR Service[5] can voluntarily transfer from the [Walmart] DVDR Service to the Netflix DVDR Service;" and that the parties desire to enter into a relationship whereby Walmart and Netflix will "undertake promotional activities on behalf of each other."  See Weibell Decl., Ex. 1 at §§ A, B, C; see also Ruan Decl., Ex. 122.  To that end, the agreement more specifically provides:

- that Walmart agrees to promote Netflix's DVDR service on Walmart's website in order to generate subscribers for Netflix and in order to provide a "mechanism and program" for current Walmart DVDR service customers whereby these current customers can transition to the Netflix DVDR service during an initially defined transition period;

- that in exchange for initially transitioning current customers from Walmart's online DVD rental service to Netflix's, Netflix agrees to pay Walmart 10% of the monthly subscription revenue generated from those transitioned customers, with payments to be made on a quarterly basis;

- that in exchange for each consumer that becomes a Netflix subscriber as a result of Walmart's promotion of Netflix's services on the Walmart.com site (excluding current customers who are transitioned), Netflix will pay a $36 bounty price to Walmart;

- that Netflix shall provide Walmart with a promotional marketing campaign during the transition period that "will highlight [Walmart's] movie department area" as well as specific movie titles; and

- that Netflix will identify and promote key movie releases that can be purchased on the Walmart website.

Weibell Decl., Ex. 1 at §§ 1.15, 3.12, 4.2, 6.1, 6.2.  The agreement expressly states that nothing in it "shall preclude [Walmart] from offering a DVD rental service."  See id. at § 3.14.  The agreement does not address Netflix's participation in the market for the sale of new DVDs or movies in any way.  See generally id.

In addition to the Promotion Agreement, plaintiffs also submit the following relevant evidence:  a joint press release issued by Netflix and Walmart on May 19, 2005 regarding their joint promotional agreement; and statements made by CEOs Hastings and Fleming, as well as various Netflix and Walmart employees, in various emails and to the press.  The

---

[5]      The "DVDR Service" is defined in the Promotion Agreement as the online DVD rental service offered by each party.  Weibell Decl., Ex. 1 at §§ 1.7, 1.16.

May 19, 2005 press release announced Walmart's discontinuation of its online DVD rental service and stated, among other things, these parties' desire to "market one another's key movie business at their respective websites...".  See Ruan Decl., Ex. 106 at *5643 (quoting Hastings as saying "'[t]his agreement bolsters both Netflix's leadership in DVD movie rentals and Wal-Mart's strong movie sales business . . . .'").  The various CEO and employee statements generally characterize the parties' understanding of the true nature of the Promotion Agreement.  See, e.g., Ruan Decl., Ex. 5 at *280553; Ex. 18 at 14:1-9, 40:7-15; Ex 65; Ex. 87; Ex. 127; Ex. 128; Ex. 134; Ex. 137 at *6199.

To the extent plaintiffs first posit that the agreement's provisions reciting Walmart's decision to exit the online DVD rental market, and allowing for the "transition" of Walmart customers to Netflix's online DVD rental service, provide "direct" evidence of the parties' agreement to eliminate Walmart from the online DVD rental market, the court is unpersuaded.  Plaintiffs may correctly recite that an agreement that eliminates a potential competitor from a single market or a competitor's access to a class of customers in a single market is per se unlawful.  However, this is simply not what the present agreement on its face discloses.  The Promotion Agreement on its face discloses an agreement by both parties to undertake cross-promotional efforts with respect to each other's complementary online DVD rental and sales services, in light of Walmart's independent decision to exit the DVD rental market.  Not only does the agreement expressly acknowledge the "independent" nature of Walmart's decision to exit the market, but it furthermore expressly states that Walmart is free to re-enter the same market.  Under these circumstances, the court cannot agree that the agreement on its face reflects a blatant agreement to eliminate Walmart from the online DVD rental market as a form of market allocation.

To the extent, moreover, that plaintiffs urge the court to combine its review of the Promotion Agreement's terms with a review of the May 19, 2005 press release in order to conclude that direct evidence of a quid pro quo agreement between the parties to allocate online DVD rental and sales markets is present, the court remains unconvinced.  As noted,

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   the Promotion Agreement does not support a finding that the parties expressly agreed to

2   remove Walmart from the online DVD rental market.  It thus provides even less support for

3   a finding that the parties expressly agreed to remove Walmart from the online DVD rental

4   market in exchange for Netflix's agreement to remove itself from the online DVD sales

5   market.  Indeed, and as defendant highlights, the agreement is silent as to any agreement

6   made by Netflix with respect to online DVD sales whatsoever.  See Safeway, 651 F.3d at

7   1137 (revenue sharing agreement among grocers did not constitute market allocation

8   agreement because agreement did not "prevent any [d]efendant from actually making

9   sales" to consumers).  As for the joint press release, it states, as plaintiffs point out, that the

10  Promotion Agreement covers the parties' "core online movie business - Walmart.com's

11  movie sales and Netflix's DVD movie rentals."  See Ruan Decl., Ex. 106 at *5643.  The

12  press release further recites that Walmart's existing online DVD rental customers will be

13  offered the option to become Netflix subscribers, and that Netflix in return will promote

14  Walmart's online movie sales business.  See id.  However, plaintiffs ignore that the press

15  release also recites Walmart CEO Fleming's view that the promotion agreement "not only

16  distinguishes both [parties'] core online competencies, but offers a complementary solution

17  of value, service, and convenience to customers."  Id.  Similarly, Netflix CEO Hastings is

18  quoted as stating that the agreement will "provide[] customers even more choices and

19  convenience."  Id.  Thus, even if the court credits plaintiffs' argument that the press release

20  reveals the parties' quid pro quo agreement by referencing the agreement's reach over

21  Walmart's movie sales business and Netflix's movie rental business, the court must also

22  credit the statements therein noting that the agreement with respect to these markets is

23  complementary and possessed of consumer value – statements which fail to suggest the

24  existence of a manifestly anticompetitive agreement to allocate the markets for online DVD

25  sales and rentals.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877,

26  8861 (2007)(to justify per se condemnation, a challenged practice must have "manifestly

27  anticompetitive" effects and lack "any redeeming virtue").

28

United States District Court
For the Northern District of California

1    Nor does plaintiffs' reliance on the remaining evidence in support of a purportedly

2    broader "quid pro quo" agreement between the parties, pursuant to which Walmart exited

3    the online rental DVD market in exchange for Netflix's corresponding agreement to refrain

4    from entering the market for new DVD sales, ultimately fare any better in establishing

5    grounds for per se treatment.  As noted, plaintiffs rely not only on statements made by

6    Fleming and Hastings, but by Walmart and Netflix employees, in arguing that both parties

7    clearly understood that the true nature of the Promotion Agreement was a market allocation

8    agreement that would divide the markets for online DVD rentals *and* sales.  See, e.g., Ruan

9    Decl., Ex. 72; Ex. 91; Ex. 96; Exs. 100-02; Exs. 127-28.

10    However, this evidence fails to definitively suggest that Walmart's decision to exit the

11    online DVD rental market was not truly independent, but rather the product of Netflix's

12    collusive activity; that Walmart failed to meaningfully preserve or maintain its ability to re-

13    enter the online DVD rental market; that Netflix intended to refrain from engaging in the

14    sale of new DVDs as a corollary to the agreement; and overall, that Netflix's goal in

15    securing the Promotion Agreement was to secure reduced competition in the online DVD

16    rental market.  The evidence provides, at a minimum, credible support for Netflix's

17    contention that the eventual agreement between the parties reflected Netflix's desire to

18    capitalize on Walmart's independent realization that its online DVD rental service was not

19    profitable, and to profit from such realization by negotiating terms upon which Netflix could

20    acquire Walmart's existing subscriber base and then improve upon this acquisition with

21    cross-promotional efforts.  As such, and while the evidence may not be dispositive of the

22    foregoing (a fact that only serves to strengthen plaintiffs' rule of reason argument that the

23    parties' joint promotional agreement is in fact unreasonable and anticompetitive), it is

24    nonetheless insufficient in the court's view to place the Promotion Agreement squarely

25    within the category of agreements exhibiting the traditional hallmarks of a "naked" market

26    allocation agreement effecting such an obvious restraint on a given market that per se

27    treatment is appropriate.

28

United States District Court

For the Northern District of California

1    Indeed, and based in part on this finding, the court also concludes that plaintiffs

2    cannot demonstrate that the Promotion Agreement was so lacking in procompetitive virtues

3    that the agreement should be deemed as a matter of law to lack "any redeeming virtue" – a

4    necessary finding for per se condemnation.  For as defendant notes, and plaintiffs do not

5    dispute, the Promotion Agreement provided for Walmart's promotion of Netflix rental

6    services and the ability for current Walmart subscribers to transition to Netflix services – all

7    of which would have increased overall market output in rentals.  See Weibell Decl., Ex. 7 at

8    36:10-40:15; Ex. 6 at 53:9-22; Ex. 3 at 240:3-12.  Furthermore, Walmart's maximum

9    number of subscribers peaked at 56,852 subscribers, and was outnumbered by Netflix's

10   subscriber base by a factor of 39.  Weibell Decl., Ex. 29, ¶ 32.  This minimal market

11   presence cuts against a finding that the joint Promotion Agreement would tend to restrict

12   competition.  In Safeway, for example, the Ninth Circuit considered whether a revenue

13   sharing agreement between grocers could be classified as a market allocation agreement

14   worthy of per se treatment.  In concluding that the revenue sharing agreement could not be

15   deemed manifestly anticompetitive or "facially appear[ed] to be one that would always or

16   almost always tend to restrict competition," the court noted in part that the grocers

17   maintained market shares ranging as high as 54.4% and 76% of the grocery market, yet

18   nonetheless faced competition from other grocers.  See Safeway, 651 F.3d at 1136.

19   Walmart's minimal market share here is thus even more unlikely to restrict competition.

20   Furthermore, in the face of continued competition from Blockbuster after the agreement,

21   there was at least a "significant probability" that Netflix retained incentives to continue

22   competitive conduct.  See id. (declining to adopt per se treatment because "there is a

23   significant probability that the grocers retained incentives to continue - or even to increase -

24   discounting and advertising of grocery products to prevent the loss of customers and profits

25   during the strike period").

26       Finally, it must be remembered that per se treatment is proper only "[o]nce

27   experience with a particular kind of restraint enables the [c]ourt to predict with confidence

28

15

**United States District Court**
For the Northern District of California

1   that the rule of reason will condemn it." <u>Arizona v. Maricopa Cnty. Med. Soc'y</u>, 457 U.S.

2   332, 344 (1982); <u>Leegin,</u> 551 U.S. at 887 (2007)(second alteration in original)(quoting

3   <u>Cont'l T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 58–59 (1977))("[A] 'departure from the

4   rule-of-reason standard must be based upon demonstrable economic effect rather than ...

5   upon formalistic line drawing.'").  To that end, the Supreme Court has "'expressed

6   reluctance to adopt per se rules where the economic impact of certain practices is not

7   immediately obvious.'" <u>Texaco Inc. v. Dagher</u>, 547 U.S. 1, 5 (2006)(quotation marks and

8   ellipses omitted)(quoting <u>State Oil</u>, 522 U.S. at 10).  Given that the economic impact of the

9   Promotion Agreement is not immediately obvious – in light of the foregoing observations –

10  and in view of the plaintiffs' inability to cite any legal authority otherwise clearly establishing

11  the manifestly anticompetitive nature of joint promotion agreements such as the one in

12  question, the court declines to make a 'categorical judgment' that the instant agreement

13  constitutes the type of restraint that would justify per se treatment.

14          In sum, and on balance, the court concludes that plaintiffs have not sustained their

15  burden to demonstrate that the Promotion Agreement constitutes a naked restraint on

16  competition in the form of an express "quid pro quo" agreement to allocate the market for

17  online DVD rentals and sales.  Because plaintiffs have failed to come forward with evidence

18  suggesting the presence of a "garden-variety horizontal division of a market," the court, as

19  instructed by <u>Safeway</u>, is compelled to "eschew per se treatment in favor of rule of reason

20  analysis."

21          Accordingly, the court finds that the Promotion Agreement was not an unlawful

22  market allocation agreement and summary judgment with respect to the application of per

23  se analysis is GRANTED in defendant Netflix's favor.

24          b.      Rule of Reason

25          Having determined that per se treatment is inappropriate in this case, the court

26  defaults to the presumptive standard for evaluating whether the Promotion Agreement is

27

28

16

United States District Court

For the Northern District of California

1  unreasonable: the rule of reason.[6]  The rule of reason requires the antitrust plaintiff to

2  "demonstrate that a particular contract or combination is in fact unreasonable and

3  anticompetitive."  Safeway, 651 F.3d at 1133.  It "weighs legitimate justifications for a

4  restraint against any anticompetitive effects."  See id. at n. 10.  Generally, the court must

5  "review all the facts, including the precise harms alleged to the competitive markets, and

6  the legitimate justifications provided for the challenged practice" in order to determine

7  whether the anticompetitive aspects of the challenged practice outweigh procompetitive

8  effects.  Id.

9        Defendant generally contends that the undisputed evidence demonstrates the

10  absence of any harm to the online DVD rental market as a result of the Promotion

11  Agreement, and moreover, that the Promotion Agreement has actually benefitted

12  consumers.  In support of its argument, defendant submits evidence of the following:  that

13  Walmart independently decided to exit the online DVD rental market; that Walmart's

14  significance to the market and ability to impact the market was minimal; that Netflix pricing

15  has declined in the years since the Promotion Agreement, both in terms of overall price and

16  in terms of cost per movie shipped or streamed; output has increased as Netflix's

17  subscriber base has grown (subscribers increased from 5.4 million to 21 million by the end

18  of the damages period); and service quality has improved as measured by delivery times,

19  title inventory, and technological innovation (i.e., streaming).  See Weibell Decl., Ex. 7 at

20  32:6-33:1; Ex. 12 at 121:11-123:9; Ex. 15 at 347:7-14; Ex. 22 at 110:2-6, 184:6-16; Ex. 29,

21  ¶¶ 23-25, 32, 41, 138 and App. 1, Chart 7; Ex. 37 at *049; Ex. 48; Ex. 50-51; Ex. 63; Ex.

22  67; Ex. 114; Ex. 115 at *810, *824, *829; Hastings Decl., ¶¶ 10, 31; Neasmith Declaration

23  ¶¶ 3-4; see also Ruan Decl., Ex. 142, ¶ 28.

24  _____

25  [6]    The court notes that plaintiffs briefly contend that the Promotion Agreement
   should be condemned via "quick look" analysis.  However, the parties devote no more than a
26  cursory reference to this argument, and instead devote their argument to traditional rule of
   reason analysis.  Thus, rule of reason analysis is the only question that has properly been
27  raised before the court for disposition, as an alternative to the parties' per se violation
   arguments.  Moreover, the court finds any quick look analysis unnecessary at any rate, in view
28  of the court's finding that a rule of reason analysis is unnecessary, as set forth herein.

United States District Court

For the Northern District of California

1    Plaintiffs, for their part, respond that undisputed evidence regarding the nature of the

2   online DVD rental market demonstrates that Netflix's conduct in securing and executing the

3   Promotion Agreement does constitute an unreasonable restraint of trade.  Plaintiffs note:

4   Netflix possesses a 70% or greater share of the online DVD rental market; that market

5   concentration increased after the Promotion Agreement, as the online DVD rental market

6   moved from a three firm market to a two firm market; that a decrease in service quality

7   occurred after the Promotion Agreement, reflected by Netflix's discussions about

8   decreasing movie title count, and its institution of a 28 delay on the availability of new

9   releases.  See Ruan Decl., Ex. 104; Ex. 116 at 34; Ex. 142, ¶ 28; Ex. 151-52.  Plaintiffs

10   also take issue with defendant's contention that Walmart made a unilateral decision to exit

11   the market, noting that Walmart was poised to rapidly grow its subscriber base via a major

12   deal with Yahoo! and gain traction in the online DVD rental market.  See id., Exs. 36-38;

13   Exs. 51-52.  From these facts, and when combined with other undisputed facts

14   demonstrating Hastings' attempts to reach and finalize a deal with Walmart during heavy

15   price competition in late 2004 and early 2005, plaintiffs contend that a reasonable juror

16   could infer harm to competition in the online DVD rental market as a result of the Promotion

17   Agreement.

18    Whereas the court might normally be inclined to conclude that plaintiffs' evidence

19   raises a triable issue of fact as to whether the online DVD rental market was negatively

20   impacted as a result of the Promotion Agreement, as measured by lower output and

21   unresponsiveness to consumer preference, see Nat'l Collegiate Athletic Ass'n v. Bd. of

22   Regents of Univ. of Okla., 468 U.S. 85, 107 (1984), actual detailed analysis of the foregoing

23   is unnecessary.  For as is made clear below, the court ultimately concludes that plaintiffs

24   have not, and cannot demonstrate, a triable issue as to competitive injury.

25    c.   Causal Injury-in-Fact

26    As noted at the outset, litigation of a successful antitrust claim requires more than

27   proof of a defendant's antitrust violation.  It requires as well that a plaintiff prove what is

28

18

United States District Court

For the Northern District of California

1   known as 'injury in fact' – i.e., the fact of harm to plaintiff, caused by the defendant's

2   conduct.  See, e.g., Northwest Publ'ns, Inc. v. Crumb, 752 F.2d 473, 476 (9th Cir.1985)

3   ("[c]ausal antitrust injury is an essential element of any remedy under the Sherman Act").

4   To demonstrate injury in fact, it is "generally sufficient to show with reasonable probability

5   some causal connection between the antitrust violation and [plaintiff's alleged injury]."

6   Northwest Publ'ns, 752 F.2d at 476; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith

7   Radio Corp., 475 U.S. 574, 585-86 (1986)(in order for plaintiff to survive defendants'

8   motions for summary judgment, therefore, plaintiff must establish that there is a genuine

9   issue of material fact as to whether defendants entered into an illegal conspiracy that

10  caused respondents to suffer a cognizable injury).

11          Plaintiffs generally advance a theory of injury that posits that plaintiffs were

12  individually harmed as a result of the unlawful Promotion Agreement, because they paid

13  supracompetitive prices for their Netflix subscriptions as a result.  Plaintiffs appear to

14  concede that the supracompetitive price was not established through a direct price increase

15  by Netflix following Walmart's exit from the market after the agreement was announced, but

16  rather by Netflix's ability to maintain the subscription fees it charged prior to the Promotion

17  Agreement, which fees would have necessarily been lower without the unlawful agreement

18  in place.  Plaintiffs' theory depends on proof that in the but-for world (i.e., absent the

19  allegedly anticompetitive agreement), Walmart would have continued to compete in the

20  online DVD rental market and Netflix would have lowered its prices to $15.99 as a result.

21  Defendant, however, questions plaintiffs' ability to demonstrate this is the case, since

22  Walmart was an insignificant competitor in the online DVD rental market, and neither its exit

23  nor its participation in the market had any impact on Netflix pricing.

24          Preliminarily, the court addresses Netflix's contention that plaintiffs failed to respond

25  in their opposition brief to Netflix's argument that plaintiffs cannot demonstrate injury in fact,

26  and that on this basis, plaintiffs have either waived or conceded any opposing argument on

27  this point.  While the court agrees that plaintiffs did not respond to the argument in their

28

United States District Court

For the Northern District of California

1    papers, and furthermore that failure to respond to an argument on its merits might normally

2    be viewed as grounds for waiver or concession of the argument, the court declines to so

3    find in the instant matter.  Plaintiffs substantively opposed defendants' arguments at the

4    hearing on the motions, and in light of the complexity of the issues and evidence presented

5    in this case, the court prefers to dispose of defendant's injury argument on its merits, rather

6    than by way of a procedural technicality.

7         Turning now to the merits of plaintiffs' injury claims, premised as they are on Netflix's

8    ability to refrain from lowering prices as a result of unlawfully securing Walmart's exit from

9    the marketplace, plaintiffs employ voluminous evidence in service of this larger point.  For

10   proof that Walmart did, in fact have a price impact on Netflix, they note:  that in April 2003,

11   just before Walmart entered the market, Netflix discussed a price increase internally and

12   concluded it "didn't want to risk it while Walmart [was] still lurking" Netflix therefore had

13   price disciplining effect; that in an October 2004 CBS business interview, Hastings

14   acknowledged that Netflix is "up against Walmart, Amazon, Blockbuster, and that gives

15   anybody smart reason to worry.  And it's why we're doing the price cut...;" and that in

16   January 2005, Hastings recognized in an internal email Walmart's recent price cut on its 2U

17   plan from $15.54 to $12.97, and noted that the 3U plan was still at $17.36.  See Ruan

18   Decl., Ex. 30; Ex. 61; Ex. 78.  According to plaintiffs, this undisputed evidence – taken in

19   combination with proof that Hastings reached out to Fleming in pursuit of a deal throughout

20   late 2004 and early 2005 – demonstrates the "price disciplining" effect that Walmart exerted

21   on Netflix pricing and proves that Netflix's pricing decisions were impacted by Walmart's

22   presence in the market .

23        Plaintiffs also assert that the undisputed evidence proves not only that Walmart

24   exhibited downward pricing pressure on Netflix, but also that if Walmart had continued to

25   compete in the market, Netflix would have affirmatively lowered its price to $15.99 (or $16,

26   its functional equivalent) prior to the timing of the Promotion Agreement.  Staff minutes

27   taken in January 2005, wherein the Netflix staff discussed Blockbuster's $14.99 price, note

28

United States District Court

For the Northern District of California

1    that Netflix considered a shift in price to $16.  See Ruan Decl., Ex. 83 ("If we can't hold,

2    shift price – perhaps $16?").  Similarly, a January 2005 quarterly business review slide

3    indicates that, in an internal discussion of the $15 Blockbuster pricing, Netflix considered

4    that it would "hold at $18" but could always cut price later, stating that it would "find some

5    way to make lemonade from having to go to $16, but not easy."  See Ruan Decl., Ex. 84.

6    January 2005 emails from Netflix executive Kilgore also reflected her view not only that

7    Netflix "may need to change [its] pricing," but also that a "price decrease is more likely than

8    not" and that it if did happen, it would happen mid-March.  See Ruan Decl., Ex. 80; Ex. 82;

9    see also id., Ex. 81 (Netflix executive noting that "competition breaks us this year or we

10   achieve total world domination"); Ex. 150 (internal Netflix email dated 10/18/2004 analyzing

11   different P&L scenarios if plan priced at $17, $16 and $15).

12         To bolster its proof that Walmart impacted Netflix pricing and that Walmart's

13   continued competition in the market would have led to lower pricing by Netflix, plaintiffs

14   further point to proof of Walmart's competitive significance in the online DVD rental market.

15   In May 2005, for example, Netflix executive Barry McCarthy recognized, in discussing the

16   potential value of an Amazon advertising deal, that the absence of Amazon and Walmart

17   from the market would have an impact on Netflix's standing in the market.  See Ruan Decl.,

18   Ex. 168 ("[t]ake walmart and [Amazon] out and investors will annoint us the category killer

19   [in] the online space").  Plaintiffs also submit numerous internal emails from both Netflix and

20   Walmart purportedly demonstrating that both companies viewed Walmart as a significant

21   competitor to Netflix.  See, e.g., Ruan Decl., Ex. 6; Ex. 33; Ex. 52.

22         Finally, plaintiffs rely on the expert testimony of their economics expert, Dr. Beyer,

23   for confirmation that competition from Walmart had a significant impact in the market and

24   on Netflix pricing specifically.  Dr. Beyer testifies:  that eliminating a competitor from the

25   market would increase Netflix's profits and strengthen investors' view that Netflix would be

26   a viable investment going forward; that Walmart's competition against Netflix, given

27   Walmart's commitment to providing lower prices, was a factor in Netflix's performance in

28

21

United States District Court

For the Northern District of California

the market; that Walmart would have remained in the market and increased in significance over time; that going from a three firm market to a two firm market (such as what occurred when Walmart exited the market, leaving only Netflix and Blockbuster) allowed Netflix to participate in a duopoly and avoid a price decrease; that Netflix would have lowered its prices prior to the date of the Promotion Agreement.  See Ruan Decl., Ex. 141, ¶¶ 10, 40, 54-55, 80-91; see id., Ex. 142 ¶¶ 70-72, 93 (calculating damages based on the but-for benchmark price of $15.99).  Dr. Beyer's testimony is complemented by the testimony of Gregory Gundlach, plaintiffs' marketing expert, who opines that Walmart's resources and marketing strategies would have led to continued growth if it had stayed in online DVD rentals, which would have inevitably had "significant downward impact on prices."  See Weibell Decl., Ex. 27, ¶ 9.

Netflix acknowledges the wealth of plaintiffs' evidence, but contends that even if credited, plaintiffs' facts amount to no more than an exercise in futility.  This is so, it says, because equally undisputed facts conclusively demonstrate that, even assuming that all the foregoing is true, Walmart's exit from the market in no way prevented Netflix from effectuating a price decrease.  Defendant points to: evidence that none of the competitors in the online DVD rental market at the time of the Promotion Agreement – neither Netflix, Blockbuster, nor potential competitor Amazon – thought that Walmart was enough of a competitive threat to base pricing decisions upon; that the objective evidence of the pricing decisions that Netflix did make throughout the time of Walmart's competition in the online DVD rental market demonstrate that Walmart exerted no pricing pressure on Netflix whatsoever, downward or otherwise; and that plaintiffs' own expert, Dr. Beyer, conceded the undisputed fact that Walmart's share of the online DVD rental market only ever reached as high as 1.5%.  See, e.g., Weibell Decl., Ex. 29 ¶ 76, Chart 4; id., Ex. 29 at App. 1; id., Ex. 74 at *480 (Walmart projection showing marketing expenditures of $2.525 million for fiscal years 2003-06), cf. Ex. 76 at 1, Ex. 77 at 22 (Netflix reported $325 in marketing expenditures for equivalent time frame); Ex. 38 at *929 (Netflix presentation observing "no

United States District Court

For the Northern District of California

1   impact" as a result of Walmart's service and predicting no impact going forward); Ex. 75 at

2   *839; Ex. 4 at 174:12-18 (Kilgore testifying that Walmart's DVD rental service "had never

3   amounted to anything" and was "absolutely inconsequential"); Ex. 15 at 347:3-14

4   (Blockbuster executive testifying Walmart "did not impact" Blockbuster pricing); Ex. 18 at

5   205:2-6, 234:16-235:9 (Amazon testimony that when preparing to enter market, it viewed

6   Walmart's online DVD rental business as "completely sub par"); see also Weibell Decl., Ex.

7   22 at 184:6-16.  All of which, concludes defendant, makes it impossible for plaintiffs to

8   establish any triable issues of fact as to Walmart's competitive significance or the claim that

9   Netflix would have lowered prices in response to Walmart's continued participation in the

10  market, in the absence of the Promotion Agreement.

11      Ultimately, the court agrees with Netflix.  While the record is disputed with respect to

12  whether Netflix internally viewed Walmart as a strong competitor at various points in time,

13  there is simply no material dispute as to whether Walmart in fact impacted Netflix's pricing

14  decisions and whether, in the face of Walmart's continued competition (i.e., absent the

15  Promotion Agreement), Netflix would have lowered its prices to the $15.99 price point that

16  plaintiffs assert.  First, plaintiffs do not actually challenge the following objective evidence:

17  that Netflix never lowered its pricing in response to Walmart's entry into the market in June

18  2003, although Walmart entered the market at a lower price for a comparable 3U plan; that

19  when Netflix did change price, it did so with a price increase one year later; that when

20  Netflix finally subsequently announced a lower price in October 2004, it did so only after

21  Blockbuster had entered the market at a lower price point a mere 2 months before, and

22  among rumors that Amazon was about to enter the marketplace; that in January 2005,

23  Walmart's subscriber share of the online DVD rental market was a mere 1.5%; and that

24  Netflix never raised its 3U price in response to Walmart's exit from the market.  See Weibell

25  Decl., Ex. 29, ¶ 76 & App. 1; see also id., Exs. 39-41.

26      Second, and more significantly, the actual facts belie plaintiffs' attempt to catapult

27  Netflix's internal debate over whether to lower its prices in response to Blockbuster's

28

23

United States District Court

For the Northern District of California

December 2004 $14.99 price decrease into a triable dispute as to whether Netflix would have lowered its price to $15.99 in the face of Walmart's continued competition in the market for online DVD rentals.  Plaintiffs do not challenge, for example, that the internal Netflix discussion over whether to lower its price to $15.99 following Blockbuster's price drop, even if substantial, was (1) in response to Blockbuster (not Walmart); (2) always couched in terms of possibility; and (3) never actually occurred.  Thus, the undisputed evidence demonstrates at best, that Netflix *may* have considered lowering its price to $15.99 in order to combat *Blockbuster*, and at worst, nothing really at all, since the much talked about price decrease never did happen, despite Blockbuster's continued presence in the market.  Since plaintiffs' theory of injury ultimately depends upon proof of what Netflix would have done, rather than what Netflix *could* have done, the evidence therefore falls far short of the necessary mark.

In short, even viewing the undisputed facts in the light most favorable to plaintiffs, the court concludes that no reasonable juror could believe that Netflix would have lowered its 3U price to $15.99 in response to continued competition from Walmart, whose 3U price was set at $17.49 – particularly when those facts demonstrate that Netflix chose *not* to lower its price in the face of Blockbuster's $14.99 price cut, despite the fact that Blockbuster had a higher market share than Walmart.

Nor can plaintiffs' expert vault plaintiffs over the injury hurdle.  As defendant points out, and plaintiffs conceded at the hearing, one of the fundamental opinions upon which plaintiffs' injury case rests – i.e., Dr. Beyer's testimony that Walmart's exit from the market allowed Netflix to move from a three firm market to a two firm market, which market structure allows for price collusion and in this case, price stabilization that would not otherwise have occurred – depends upon the premise that all competitors in the market have sufficient competitive significance.  Yet, in his deposition testimony, Dr. Breyer concedes that no competitors responded competitively to Walmart in online DVD rental in pricing terms.  See Weibell Decl., Ex. 22 at 13, 147-148.  Moreover, as the Ninth Circuit

United States District Court

For the Northern District of California

1    has recognized, expert testimony cannot substitute for market facts – and cannot defeat

2    them, when the facts themselves render plaintiffs' theory of injury unreasonable, as they do

3    here. See Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995).

4           Indeed, the court finds defendant's reliance on Gerlinger v. Amazon.com, Inc., 526

5    F.3d 1253, 1255-56 (9th Cir. 2008), particularly apt.  In Gerlinger, a plaintiff consumer

6    sought to challenge Amazon's agreement with Borders book store, which agreement

7    allowed Amazon to take over operation of Border's online sales, and which agreement

8    plaintiff challenged as an unlawful market allocation.  Plaintiff Gerlinger alleged that as a

9    result of the marketing agreement, he was "forced to pay supra-competitive prices for [his]

10   purchases."  There, as here, there was no post-agreement price increase, and plaintiff's

11   theory of harm was premised on the argument that, had Borders continued its operation of

12   its online store, prices would have been even lower.  In rejecting this theory of injury, the

13   Ninth Circuit noted that plaintiff had not personally paid a higher price for a book as a result

14   of the agreement, nor did he demonstrate any other potentially conceivable form of injury

15   stemming from the loss of Border's potential competitive effect.  Gerlinger, 526 F. 3d at

16   1255-56.

17          So here.  Plaintiffs have not demonstrated that they personally paid higher prices for

18   subscriptions as a result of the agreement, nor have they demonstrated that they would

19   have paid lower prices absent the agreement.  In short, plaintiffs fail to create a triable

20   issue of fact as to their theory of injury in fact: i.e., that Netflix would have lowered its prices

21   to $15.99 absent the purportedly unlawful Promotion Agreement (and assuming Walmart's

22   continued participation in the market).

23          Summary judgment for failure to adequately raise a triable issue of fact as to causal

24   injury in fact is therefore appropriate.  Defendant's motion on this ground is accordingly

25   GRANTED.

26          d.      Section 2 Claims

27          Defendant also seeks summary judgment with respect to the Sherman Act section 2

28

25

United States District Court

For the Northern District of California

1  claims asserted by plaintiffs.  Section 2 of the Sherman Act provides that it is illegal to

2  "monopolize, or attempt to monopolize ... any part of the trade or commerce among the

3  several States."  See 15 U.S.C. § 2.  Generally, to establish a claim for unlawful

4  monopolization under pursuant to section 2, a plaintiff must demonstrate that the defendant

5  "(1) possessed monopoly power in the relevant market and (2) willfully acquired or

6  maintained that power as opposed to gaining that power as a result 'of a superior product,

7  business acumen, or historical accident.'"  See United States v. Grinnell Corp., 384 U.S.

8  563, 570-71(1966).

9      The parties do not dispute, however, that as with plaintiffs' section 1 claim, causal

10  injury in fact must be demonstrated if plaintiffs are to succeed on their section 2 claims.  As

11  such, and for the same reasons as outlined above in connection with the court's discussion

12  of causal injury in fact, the court also concludes that plaintiffs cannot demonstrate injury in

13  fact for purposes of their section 2 claims.

14      Accordingly, summary judgment is also appropriate with respect to plaintiffs' section

15  2 claims.

16                                          * * *

17      In sum, and for all the foregoing reasons, the court hereby GRANTS defendant's

18  motion for summary judgment with respect to all claims asserted in plaintiffs' complaint.

19  B.    Motions to Exclude and to Strike Testimony

20        1.    Plaintiffs' Motion for Leave to File Motions to Strike

21      Netflix contends that plaintiffs separately filed its motions to strike the Hastings and

22  Hyman declarations in violation of Civil Local Rule 7-3, which requires that evidentiary

23  objections to the motion be contained within the opposition brief, thereby circumventing the

24  page limits on the opposition brief.  In response, plaintiffs subsequently filed the instant

25  motion for leave to file the motions to strike.  Netflix has not been unduly prejudiced by the

26  filing of the motions, and has taken the opportunity to respond to plaintiffs' evidentiary

27  objections.  Plaintiffs' motion for leave to file is therefore GRANTED.

28

United States District Court

For the Northern District of California

1    2.    Plaintiffs' Motion to Strike Reed Hastings Declaration

2    Plaintiffs move to strike the declaration of Netflix CEO Reed Hastings in support of

3    the motion for summary judgment on the ground that portions of his declaration are

4    inconsistent with his deposition.  Because plaintiffs have an opportunity to point out

5    inconsistencies in Hastings' testimony and challenge the credibility of statements in his

6    declaration, this motion to strike is DENIED.  Plaintiffs' hearsay objections to Hastings'

7    statements are overruled because Netflix demonstrates that his statements are not offered

8    to prove the truth of the matter asserted, and are offered only to establish Hastings'

9    understanding or belief.

10    3.    Plaintiffs' Motion to Strike David Hyman Declaration

11    Plaintiffs move to strike the declaration of Netflix General Counsel and Secretary

12    David Hyman in support of the motion for summary judgment on the ground that his

13    declaration purports to give evidence about the outcome of factfinding efforts by the

14    Federal Trade Commission and two state attorneys general.  Netflix contends that the

15    decision by three separate antitrust agencies to refrain from conducting a full civil

16    investigation after reviewing the Promotion Agreement with Walmart is relevant because

17    the evidence makes it less probable that the agreement either facially or implicitly allocates

18    markets and customers.  The probative value is limited, as Hyman does not have first hand

19    knowledge of facts underlying the decision by those government entities not to initiate

20    formal investigations.  Because plaintiffs have had the opportunity to address the weight of

21    that evidence, and this is a dispositive motion before the court, plaintiffs do not establish

22    any prejudice from allowing the evidence to be part of the record.  Therefore the motion to

23    strike the Hyman declaration is DENIED.

24    4.    Netflix's Motion to Exclude Beyer Testimony

25    Netflix moves to exclude the expert testimony of plaintiffs' economic expert, Dr. John

26    Beyer, pursuant to FRE 702 on the ground that his conclusions are speculative and

27    unsupported by facts in the record.  Netflix does not challenge Dr. Beyer's credentials or

28

27

1   the reliability of his methods, but contends that Beyer's testimony is not "based upon

2   sufficient facts or data" to satisfy the requirements of FRE 702.  Because Netflix has taken

3   the opportunity to challenge the factual assumptions underlying Beyer's report, and the lack

4   of evidence in the record to support those assumptions, it is not necessary to exclude the

5   report.  Therefore, the motion to exclude Beyer's testimony is DENIED.

6           5.      Netflix's Motion to Exclude Gundlach Testimony

7           Netflix moves to exclude the testimony of plaintiffs' expert, Gregory L. Gundlach,

8   pursuant to FRE 702 and Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579 (1993), on the

9   ground that his opinion purports to refute evidence about Walmart's decision to close down

10  its online DVD rental business before entering the promotion agreement with Netflix.  Dr.

11  Gundlach concludes, based on his consideration of Walmart's key marketing strategies,

12  that Walmart's decision to exit the business was highly unusual and inconsistent with its

13  normal past marketing practices.  Weibell Decl., Ex. 27 (Gundlach expert report).  Netflix

14  argues that Dr. Gundlach's opinion exceeds the realm of expert testimony by speculating

15  about the facts of what happened.  Netflix also contends that Gundlach ignored the factual

16  record to reach his conclusions.

17          Netflix does not challenge Gundlach's qualifications as an expert on marketing, but

18  challenges his familiarity with Walmart's marketing practices.  Plaintiffs point out that

19  Gundlach is offered to apply his expertise as a marketing academic and professional; he

20  does not purport to be an expert on Walmart specifically, but on marketing generally.  On

21  reply, Netflix raises new challenges to Gundlach's methodology, but the court finds it has

22  waived those technical objections by failing to raise them in its opening papers.

23          As with the Beyer expert testimony, Netflix has taken the opportunity to challenge

24  the factual assumptions underlying Gundlach's conclusions, as well as the lack of evidence

25  in the record to support those assumptions.  Therefore, the motion to exclude Gundlach's

26  testimony is DENIED.

27

28

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

C.    Conclusion

For all the foregoing reasons, Netflix's motion for summary judgment is GRANTED. The corresponding motions to strike and exclude evidence, are DENIED.  The pretrial and trial dates are VACATED.  Within one week Netflix shall submit a proposed judgment approved as to form by plaintiffs.

**IT IS SO ORDERED.**

Dated: November 22, 2011

_____
                    PHYLLIS J. HAMILTON
                    United States District Judge

29